UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DZURKA BROS., LLC, et al.,

             Plaintiffs,                            Case No. 1:23-cv-11038

v.                                         Honorable Thomas L. Ludington
                                            United States District Judge
LUCKEY FARMERS, INC., and
IDA FARMERS CO-OPERATIVE COMPANY, INC.

             Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS, AND DISMISSING COMPLAINT WITH PREJUDICE

Agriculture can be a risky business and grain merchandising is no exception. This case concerns multiple farmer-Plaintiffs who entered into contracts to sell their grain to two elevator-Defendants. According to Plaintiffs' Complaint, they first entered contracts that had no explicit price terms. Instead, the initial contracts referred to a second set of "accumulator" contracts the Parties entered into some months later. The accumulator contracts—a recent and potentially risky contract form within the grain industry—contemplated three different scenarios on a weekly basis, depending on the price of contracts trading on the futures market at the time: (1) if the futures price remained between a pricing floor and ceiling set by the Parties, Defendants paid Plaintiffs a higher-than-market price for the delivery of a set amount of grain; (2) if the futures price dropped below the contract floor, the contract terminated; or (3) if the futures price rose above the contract ceiling, Defendants paid Plaintiffs a below-market price for *double* the amount of grain that the contract required Plaintiffs to deliver that week. This latter scenario is known as "doubling-up".

Unfortunately for Plaintiffs, the "doubling-up" scenario occurred more frequently than anticipated, in part due to storms and drought which crippled grain production in late 2020.

Plaintiffs could not produce the "doubled-up" amount of grain as required by their contracts with Defendants. Although Defendants allowed Plaintiffs the opportunity to roll their contracts ahead for some period of time, Defendants eventually cancelled the contracts after Plaintiffs still could not produce. After the contracts were cancelled by Defendants, Plaintiffs filed an eight-count Complaint alleging three violations of the Commodities Exchange Act and various common law and contractual claims. Three of the eight Counts allege that Defendants defrauded Plaintiffs by failing to disclose the risks of the accumulator contracts and by inducing Plaintiffs to enter the contracts in the first instance. Currently before this Court are Defendants' separate Motions to Dismiss the Complaint under Civil Rule 12(b)(6). For the reasons that follow, Defendants' Motions to Dismiss will be granted and Plaintiffs' Complaint will be dismissed with prejudice.

## I.

### A. Grain Merchandising and Commodities Trading

The grain industry involves three main players: the farmers who grow the grain; the elevators that act as "middlemen" by buying grain from farmers, storing it, and selling it to end users; and the end users themselves. *See* ECF No. 1 at PageID.9.  Despite their different roles, every participant within the grain merchandising chain of commerce face risks associated with price vitality and market fluctuation. *Id.* To mitigate these risks, farmers and grain elevators can buy and sell futures contracts on the Chicago Board of Trade (CBOT).[1] *See id.* at PageID.3–4. In simple terms, a futures contract is a binding agreement to buy or sell a standardized commodity— like grain—on a specific date or during a specific month. *The Basics of Trading*

---

[1] Formed by a group of grain merchants in 1848, the CBOT was the first grain futures exchange in the United States. In 2007, the CBOT merged with the Chicago Mercantile Exchange to form the CME Group. *Chicago Board of Trade*, BRITANNICA, https://www.britannica.com/money/topic/Chicago-Board-of-Trade (last visited Nov. 28, 2023) [https://perma.cc/3V85-J5NB].

*Futures Contracts*, CHARLES SCHWAB (Feb. 6, 2023) https://www.schwab.com/learn/story/basics -trading-futures-contracts [https://perma.cc/3QZP-W385]. Most futures contracts specify the quality and quantity of the commodity, set a unit price, account for certain price fluctuations, and schedule the date and location for the physical commodity exchange. *Id.* Futures trading allows farmers and elevators to "hedge," or protect, against uncontrollable and unfavorable growing conditions, such as drought. *Id.* Indeed, "grain contracting and hedging are by design interrelated, with futures hedge positions mirroring actual grain purchase and sale commitments." ECF No. 1 at PageID.9.

Futures contracts frequently contain the terms "spot price," "futures price," and "basis." *Id.* at PageID.10. A "spot price" refers to the local cash price on a given date set by the elevator purchasing the grain. *Id.* "Futures price" refers to the price on a given date set by the applicable board of trade, such as the CBOT. *Id.* Lastly, "basis" refers to the difference, on a given date, between the spot price and the futures price, reflecting storage and transportation costs, as well as local market conditions.  *Id.*

A less traditional, recently trending, and risky contract form within grain merchandising is an accumulator contract.[2] *See id.* Accumulator contracts typically specify an "accumulation period" throughout which a farmer agrees to sell bushels in small amounts on a weekly basis. *Id.* at PageID.11. Performance under an accumulator contract depends on three prices: a Fixed Price, a Futures Price, and a Knockout Price. *Id.* The Fixed Price and the Knockout Price are set by the parties to the accumulator contract—the Fixed Price is usually set above the market price at the

---

[2] Accumulator contracts were first offered for the 2005 crop year and have since been "rapid[ly] adopt[ed]" by farmers. Stephen D. Johnson, *Accumulator Contracts*, AG DECISION MAKER: A BUS. NEWSL. FOR AGRIC., June 2006, at 1, https://www.extension.iastate.edu/agdm/newsletters/n l2006/nljune06.pdf [https://perma.cc/9QFT-YLGT].

time of contract (setting a ceiling) and the Knockout Price is usually set below (setting a floor). *See id.* at PageID.11–12. Both the Fixed Price and the Knockout Price *remain constant* throughout the contract. *Id.* The Futures Price, on the other hand, refers to a specific futures contract trading on the commodities exchange or CBOT and *fluctuates* throughout the life of the contract. *See id.* On a specified day of each week during the accumulation period, one of three conditions will trigger depending on the current value of the fluctuating Futures Price:

1. If the Futures Price is below the Fixed Price ceiling but above the Knockout Price floor, the bushels are sold at the Fixed Price. This is best thought of as the "default" scenario.
2. If the Futures Price rises above the Fixed Price ceiling, the bushels sell at the Fixed Price *but* the bushels of grain sold by the farmer to the elevator for that week *double*. This is best through of as the "doubling up" scenario.
3. If the Futures Price drops below the Knockout Price floor, the contract is—as the name suggests—knocked-out or terminated. The farmer's grain may go unsold and is subject to the normal market fluctuation. This is best thought of as the "knock out" scenario.

*See id.* at PageID.12; *see also Different Types of Grain Contracts*, DTN (Nov. 29, 2021) https://www.dtn.com/different-types-of-grain-contracts/ [https://perma.cc/K98U-ZLGG].

On one hand, farmers largely benefit from the first "default" scenario—when the Futures price remains between the Knockout Price floor and the Fixed Price ceiling—because the farmer sells his or her bushels at the Fixed Price at a time when that Price is *higher* than the Futures Price or market value. On the other hand, in any given week, based on the value of the futures price set by the CBOT, farmers run the risk of either being "knocked out" of the contract altogether *or* being forced to "double up" and sell double the agreed-upon amount of grain for the week at the Fixed Price, at a time when that price is *lower* than the futures price or market value.

With this agricultural contract context explained, this Court turns to Plaintiffs' Complaint and Defendants' alleged conduct.

- 4 -

### B. Defendant's Alleged Conduct

Plaintiffs in this case include (1) Dzurka Bros, LLC; (2) Joseph and Veronica Eickholt; (3) Fergus Farms, LLC; (4) R&L Farm and Freight, LLC; (5) Maple Row Farms, LLC; (6) Christopher Histed, doing business as K&H Farms; (7) Timothy Vergote; and (8) Douglas and Linda Wilkin, doing business as D&L Wilkin Farms. ECF No. 1 at PageID.7–8. Plaintiffs are all farmers who entered Contracts to sell their grain to Defendant Ida Farmers Co-Operative Company, LLC (Ida)—a Michigan elevator co-op that eventually transferred Plaintiffs' Grain Contracts to Defendant Luckey Farmers, Inc (Luckey)—an Ohio co-op. *See* ECF No. 1 at PageID.8, 26.

Plaintiffs began entering Grain Contracts with Defendant Ida in "2019 or 2020." *Id.* at PageID.4. Plaintiffs allege that the initial Grain Contracts they entered with Ida were "completely devoid" of price terms. *Id.* at PageID.15. Instead, under the "price" and "basis" heading, the Grain Contracts refer to the "AGRIVOSOR PROGRAM." *Id.* at PageID.17; ECF No. 1-1 at PageID.49 (emphasis in original). The Agrivisor Program took the form of Accumulator Addendums, separate documents signed by the Parties which amended the Grain Contracts to provide a specific accumulator price program.[3] *See* ECF Nos 1 at PageID.17-18, 24; 1-2. It is unclear from Plaintiffs' Complaint and attached contractual documents whether Plaintiffs, by signing the initial Grain Contract, were automatically bound by the Accumulator Addendums. On one hand, the Accumulator Addendums were expressly referenced in the initial Grain Contract documents signed by Plaintiffs as setting the price and basis. ECF No. 1-1 at PageID.49. On the other hand, the Accumulator Addendums *amended* the Grain Contracts, were separately signed by Plaintiffs,

---

[3] These Accumulator Addendums listed AgriVisor LLC as a third-party beneficiary. *See* ECF No.1-2 at PageID.52. Plaintiffs assert that AgriVisor is a now-defunct marketing company that operated at all relevant times as either Ida's broker or advisor. ECF No. 1 at PageID.20. Luckey and Ida both refer to the Accumulator Addendums as "Agrivisor Addendums." *See* ECF Nos. 13 at PageID.84; 18 at PageID.133.

and Plaintiffs have not alleged that they could not refuse to execute the Accumulator Addendums or amend the Grain Contract after initially signing. *See* ECF No. 1-2 at PageID.52.

Nevertheless, Plaintiffs allege that they did not know—because Ida did not advise them about—the financial risks these Accumulator Addendums posed but were nevertheless pressured to enter them because Ida promised, given the novelty of the Accumulator Addendums, to "work through" any issues that arose. *Id.* at PageID.20 (emphasis omitted). Plaintiffs cite the deposition testimony of Alan Peters—Ida's former grain marketing manager—in the Lenawee County Circuit Court case *Ida Farmers Co-Operative Company v. Maple Row Farms, LLC*, 22-CL-6921 in which Peters explained that Ida told the farmers it contracted with that it would allow the farmers to "roll [the Grain Contracts] ahead, cancel them, [and] work out extended delivery terms, so [the Contracts] would not be detrimental to [a] farm." *Id.* (emphasis omitted). Importantly, Peters expressly stated to the deposing attorney that a farmer could theoretically roll these Grain Contracts forward indefinitely. *Id.* at PageID.21.  A futures contract rolls[4] "when a trader moves his position from the front month contract to another contract further in the future." *Understanding Futures Expiration & Contract Roll*, CME GROUP, https://www.cmegroup.com/education/courses/introduction-to-futures/understanding-futures-expiration-contract-roll.html (last visited Dec. 7, 2023). In other words, rolling a futures contracts extends the expiration of a position by "closing the initial contract and opening a new longer-term contract for the same underlying asset at the then  current market price." Nick Lioudis, *How do Futures Contracts Roll Over?*,

---

[4] Plaintiffs provide another helpful example: "[i]f a farmer has a contract for corn, say at $6.50 for July 2023 delivery, but does not have the corn to fill the contract, the contract can be "rolled" to a farther out month, generally to December of 2023, when the farmer has harvested the 2023 corn and thus has the bushels to fill the contract." ECF No. 1 at PageID.22–23.

INVESTOPEDIA (Aug. 18 2021), https://www.investopedia.com/ask/answers/073015/how-do-futures-contracts-roll-over.asp [https://perma.cc/MP77-7GLH].

In 2021, after entering into the Grain Contracts and separately signing the Accumulator Addendums, grain prices skyrocketed to "levels not seen in over ten . . . years." *Id.* at PageID.22; *see also* Theresa Kroeger, *High Grain Prices Rippled Throughout the Economy*, 12 U.S. BUREAU OF LAB. STAT.: BEYOND THE NOS. 7 (Apr. 2023) https://www.bls.gov/opub/btn/volume-12/high-grain-prices-rippled-throughout-the-economy.htm#ednref4 [https://perma.cc/LJ23-V3WL] (explaining how "grain prices rose dramatically in the years following the start of the COVID-19 pandemic."). Indeed, the Futures Price of grain in 2021 frequently rose above the "Fixed Price" ceiling set by the Accumulator Addendum, forcing Plaintiffs to sell double the amount of grain to Ida at a lower-than-market price. *Id* at PageID.22–23. But Plaintiffs could not produce this "doubled up" amount, so their Grain Contracts rolled over. *Id.* at PageID.22. And although rolling over may have initially saved Plaintiffs from producing double the amount of grain, the roll overs allegedly significantly decreased Plaintiffs' profits when delivery became due. *See id.* Plaintiffs allege that they "ended up selling their crops for less than half the price at the time of delivery" allowing Ida to "purchase grain for less than half price of what they could sell [the grain] for on the open market." *Id.* at PageID.23.

In March of 2021, Alan Petters—Ida's grain merchandiser assigned to Plaintiffs' contracts—left Ida and began to work for Defendant Luckey. ECF Nos. 1-3 at PageID.53; 13 at PageID.84. Accordingly, Ida assigned Plaintiffs' Grain Contracts to Luckey, explaining to Plaintiffs that their Contracts would continue to be handled by Peters. ECF No. 1-3 at PageID.53. Upon assignment, Plaintiffs allege, "there were many bushels [of grain] that were unassigned," so Luckey "randomly assigned these bushels and/or created contracts without the knowledge or

consent of . . . Plaintiffs." ECF No. 1 at PageID.26. Plaintiffs also allege that "Luckey then fraudulently created [n]ew [c]ontracts so as to require Plaintiffs to be obligated for certain bushels that the Plaintiffs never committed to." *Id.* Plaintiffs allege that these new contracts, like the original Grain Contracts with Ida, "vastly exceeded any realistic expectation of the 'actual delivery' of grain" and, thus, "were illegal off-exchange commodities contracts[.]" *Id.* at PageID.27. But notably, Plaintiffs continued to agree to roll-over their contracts, now assigned to Luckey, if they could not perform as required under the Accumulator Addendums. ECF No. 13 at PageID.85; *see also* ECF Nos. 1-5 (showing Plaintiff Fergus Farms rolling over contract with Luckey); 1-6 (same).

Although the specific timeline is unclear, at some point after Plaintiffs could not deliver the "doubled-up" amount of grain to Defendants as called for by the Grain Contracts, Defendants cancelled the contracts and "attempted to enforce" the Contracts' terms. *See* ECF No. 1 at PageID.27–29; *see also* ECF No. 13 at PageID.85. Both Ida and Luckey maintain that, despite being afforded several roll overs, all "Plaintiffs failed to fully deliver on the[ir] Contracts." ECF No. 13 at PageID.85.

On May 3, 2023. Plaintiffs filed an eight-count Complaint against Defendants Ida and Luckey alleging violations of the CEA, the Michigan UCC, and common law. ECF No. 1. Defendant Luckey filed its Motion to Dismiss for failure to state a claim on June 30, 2023, and Defendant Ida filed its Motion to Dismiss for failure to state a claim, which largely mirrors Luckey's Motion, on August 7, 2023. ECF No. 19.

Importantly, before turning to Defendants' Motions to dismiss, it is worth pausing to highlight that this is not the only federal case between these Parties. After cancelling Plaintiffs' Grain Contracts, Luckey filed separate complaints in Ohio courts against Plaintiffs Dzurka Bros,

Fergus Farms, R&L, K&H, Maple Row, and Vergote. ECF No. 13 at PageID.85–86. These complaints were removed to the Northern District of Ohio[5] and Plaintiffs—defendants in those actions—filed counterclaims which Luckey alleges, "mirror their claims in this case . . . causing the parties to litigate the exact same claims in two separate federal jurisdictions." *Id.*

## II.

Under Civil Rule 12(b)(6), a pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) dismissal, the court accepts all factual allegations of the complaint as true and will construe the pleading in favor of the nonmovant. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," but the court need not accept as true the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted). If exhibits are attached to the complaint, courts may consider such exhibits when "resolving [a] Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014).

---

[5] *See Luckey Farmers Inc. v. Dzurka Bros, LLC, et al.*, Case No. 3:23-CV-01203-JJH, N.D. Ohio; *Luckey Farmers Inc. v. Fergus Farms, LLC, et al.*, Case No. 3:23-CV-01207-JGC, N.D. Ohio; *Luckey Farmers Inc. v. R&L Farm and Freight, LLC, et al.*, Case No. 3:23-CV-01088, N.D. Ohio; *Luckey Farmers Inc. v. Christopher Histed and Histed Farms, et al.*, Case No. 3:23-CV-00926, N.D. Ohio; *Luckey Farmers Inc. v. Maple Row Farms, LLC, et al.*, Case No. 3:23-CV-00927, N.D. Ohio; *Luckey Farmers Inc. v. Tim Vergote, et al.*, Case No. 3:23-CV-01091, N.D. Ohio.

**III.**

Plaintiffs' Complaint alleges CEA violations (Counts I, II, III); seeks recission of all contracts under the Michigan Uniform Commercial Code (MUCC) (Count IV); asserts a claim of common law unjust enrichment (Count V); alleges Defendants were negligent (Count VI); alleges Defendants engaged in fraud and fraud in the inducement (Count VII); and, should this Court determine that the Grain Contracts were valid, asserts a common law breach of contract alternative claim against Ida (Count VIII). *See generally* ECF No. 1 at PageID.38–47. Each Count, and Defendants' corresponding dismal arguments, will be addressed in turn.

**A.  Violations of the Commodities Exchange Act (Counts I, II, II)**

The first three counts of Plaintiffs' Complaint assert violations of the CEA. ECF No. 1 at PageID.38–42.  But the CEA only applies if the Grain Contracts are futures contracts, subject to CFTC regulation. If, on the other hand, the Grain Contracts are forward contracts, exempt from CFTC regulation under the CEA, Plaintiffs first three Counts fail to state a claim upon which relief can be granted.  Accordingly, this Court will first analyze the threshold question of whether the Grain Contracts are plausibly alleged to be subject to CFTC regulation. If so, this Court will turn to address the specifics of Counts I, II, and III.

**1.  CEA Applicability**

**i. Forward v. Futures Contracts**

Before assessing whether Plaintiffs have stated CEA claims upon which relief can be granted, this Court must first address the threshold issue of whether the Grain Contract between Plaintiffs and Defendants are excluded from the CEA and CFTC regulation. Although the Grain Contracts facially appear to be *forward* contracts—exempt from CFTC regulation—Plaintiffs have sufficiently pleaded that the Contract could be infinitely rolled and, thus, do not involve a

legitimate expectation of actual delivery, rendering them *futures* contracts subject to CFTC regulation under the CEA.

After the stock market crash in 1929 and a subsequent "drastic decline in grain prices," Congress enacted the CEA in 1936. Jerry W. Markham, *The Commodity Exchange Monopoly-Reform Is Needed*, 48 WASH. & LEE L. REV. 977, 982 (1991). Generally, the CEA (1) required that futures contracts be traded on a licensed exchange, (2) prohibited manipulation and fraud—albeit "narrowly and in the most convoluted terms[,]" (3) imposed registration requirements on commodity futures contract brokers, and (4) created the Commodities Exchange Commission to serve as a regulatory oversight body. *Id.* at 982–84. Importantly, the Commission was not an independent federal agency—such as the Securities Exchange Commission—and instead consisted of the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General of the United States. *Id.* at 982. The Secretary of Agriculture, specifically, was vested with the duty to oversee "[d]ay-to-day regulation" of the CEA but delegated this duty to the Commodities Exchange Authority, consisting of lower officials within the Department. *Id.*

But a "virtual explosion of prices in the commodities markets occurred" in the 1970s which caused Congress to conclude that "it could no longer permit the [Commodities Exchange Authority] to act as the regulator under the [CEA]." *Id.* at 984; *see also History of the CFTC: US Futures Trading and Regulation Before the Creation of the CFTC*, CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html (last visited Dec. 27, 2023) (noting that, in 1973, "[g]rain and soybean futures prices reac[ed] record highs" which was "blamed in part on excessive speculation and . . . manipulation[.]") [https://perma.cc/YT9G-VZPD]. Accordingly, Congress adopted the Commodities Futures Trading Commission Act of 1974 which created the CFTC as an independent federal agency responsible for regulating

commodity futures trading. *Id*. The CFTC was authorized to impose civil penalties for violations of the CEA and to seek injunctive relief in federal courts to prevent violations from occurring. *Id*.

But only *futures* contracts are governed by the CEA and subject to CFTC regulation. *Andersons, Inc. v. Horton Farms, Inc*., 166 F.3d 308, 318 (6th Cir. 1998). *Forward* contracts are not. The CEA cabins the CFTC's jurisdiction to those transactions involving the sale of a commodity for "future delivery." 7 U.S.C. § 2(a)(1)(A). But the CEA defines "future delivery" to expressly exclude "any sale of any cash commodity for deferred shipment or delivery," commonly referred to as a "forward contract." *See id.* § 1a(27); *Commodity Futures Trading Comm'n v. Erskine*, 512 F.3d 309, 314 (6th Cir. 2008). Therefore, the question is whether the Grain Contracts are futures contracts, governed by the CEA, or forward contracts, free from CFTC regulation. But, as recognized by the Sixth Circuit, answering this question has historically "proven difficult[,]" because the CEA "provides little guidance as to the distinctions between regulated futures contracts and excluded cash forward contracts[.]" *Id*. at 315 (quoting *CFTC v. Co Petro Mktg. Group, Inc*., 680 F.2d 573, 576 (9th Cir.1982)).

### ii. Tangible v. Intangible Commodities

In 1998, the Sixth Circuit decided *Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308 (6th Cir. 1998). In *Andersons*, grain farmers refused to deliver corn to their contractual buyer. *Id.* at 313–14. The buyer sued and the farmers filed a counterclaim arguing that the grain contracts were governed by the CEA and subject to CFTC regulation. *Id.* But the Sixth Circuit disagreed. The *Andersons* Court first included a helpful distinction between the two contract forms in a footnote:

> [A futures contract] is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. . . these contracts are standardized and transferrable. Trading in futures seldom results in physical

- 12 -

delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose [of] futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators).

In contrast to the fungible quality of futures, . . . forwards [contracts] are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity. These contracts are not readily transferable and therefore are usually entered into between parties able to make and receive physical delivery of the subject goods.

*Id.* at 318, n. 14 (quoting *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966 (4th Cir.1993)). Accordingly, the Sixth Circuit stated that the relevant metric to determine whether, under the totality of the circumstances, a particular commodities contract is a CFTC-regulated futures contract or an exempt forward contract is "whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Id.* If so, the contract is a forward contract. If there is no "legitimate expectation [of] physical delivery," the contract is a futures contract and is subject to regulation by the CFTC under the CEA. And, in concluding that the contract in question lacked a legitimate expectation of physical delivery and was a *forward* contract exempt from CFTC regulation, the *Andersons* court relied on seven factors:

(1) the only parties to the contract were the farmers or producers of grain and the elevators—no speculators from the general public were not involved;
(2) the farmers were in the business of growing grain and had the ability to make delivery on the contracts;
(3) the elevator or buyer was in the business of obtaining grain under contracts for resale and relied on actual delivery of that grain to carry out its business;
(4) the elevator or buyer had the capacity to take delivery of the grain subject to the contract;
(5) the contracts were clearly and facially grain marketing instruments, tools to accomplish the actual delivery of grain in exchange for money;
(6) delivery and payment routinely occurred between the parties in past dealings; and
(7) the plaintiffs received cash payment on the contracts only upon delivery of the actual commodity.

*See id.* at 320 (citing *In re Grain Land Cooperative, 978 F.Supp.* 1267 (D.Minn.1997))

- 13 -

Ten years later, the Sixth Circuit articulated a new forward v. futures contract test in *Commodity Futures Trading Comm'n v. Erskine*, 512 F.3d 309 (6th Cir. 2008). Notably, unlike in *Andersons*, the contract in *Erskine* involved the trading of foreign currency, an *intangible* commodity. *Id.* at 310. In *Erskine*, the Sixth Circuit held that "a futures contract is a contract for a future transaction, while a forward contract is a contract for a present transaction with future delivery." *Id.* at 322. More specifically, after considering "numerous lay definitions," the *Erskine* Court explained that a *futures* contract is: "(1) . . . standardized so that it can be traded on an exchange, and is (2) a fungible agreement to buy or sell (3) a stated unit quantity of (4) a stated commodity (5) at a stated unit price (6) at or before a stated future time." *Id.* at 323. On the other hand, the Sixth Circuit explained that a *forward* contract—exempt from CFTC regulation—is: "(1) neither standardized nor traded on an exchange, and is (2) an individual agreement to buy or sell (3) some agreed-upon quantity of (4) some commodity (5) at some agreed-upon price (6) at some agreed-upon time in the future. *Id.* at 324. Importantly, the *Erskine* Court cast doubt on the *Andersons* "legitimate expectation of delivery" test, without expressly overruling it:

> [N]one of these definitions/distinctions [reviewed by the Court] makes any mention of any anticipation of actual delivery (or lack there of). This is simply not a practical distinction. Instead, the distinction—as commonly understood—turns on the standardization and fungibility of the contract, and as the Seventh Circuit[6]

---

[6] This language refers to *Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861 (7th Cir. 2004), in which Judge Easterbrook, writing for the Seventh Circuit, expressly rejected the CFTC's argument that rolling over a *forward* contract (exempt from CFTC regulation) creates a futures contract (subject to CFTC regulation). *Id.* at 864–67. Indeed, the Seventh Circuit held that "such an approach ignores the statutory text" because:

> Treating *absence* of "delivery" (actual or intended) as a defining characteristic of a futures contract is implausible. Recall the statutory language: a "contract of sale of a commodity for future *delivery*." Every commodity futures contract traded on the [CBOT] calls for delivery. . . . Using "delivery" to differentiate between forward and futures contracts yields indeterminacy, because it treats as the dividing line something the two forms of contract have in common for commodities[.]

*Id.* at 865 (emphasis in original).

suggested, whether there is "trading in the contract," rather than trading only in the underlying commodity.

*Id.* at 325.

Courts have limited the *Andersons* and *Erskine* tests to the type of commodity contracts at issue in each case, applying the *Andersons* test to *tangible* commodity contracts and applying *Erskine* to *intangible* commodity contracts. *See, e.g.*, *L & R Farm P'ship v. Cargill Inc*., 963 F. Supp. 2d 798, 807 (W.D. Tenn. 2013) (applying *Andersons* to soybean contracts); *Commodity Futures Trading Comm'n v. UForex Consulting*, LLC, 551 F. Supp. 2d 513, 537 (W.D. La. 2008), *amended in part sub nom. Commodity Futures Trading Comm'n v. Uforex Consulting*, LLC., No. CIV.A. 07-0046, 2008 WL 1836707 (W.D. La. Apr. 2, 2008) (applying *Erskine* to intangible currency trades). Accordingly, the *Andersons* test applies here because the Grain Contracts[7] between Plaintiffs and Defendants involved the buying and selling of grain—a tangible commodity. *See Cargill*, 963 F. Supp. 2d at 806 (W.D. Tenn. 2013).

### iii. The Grain Contracts

Applying *Andersons*, it is likely—but not certain—that the Grain Contracts contemplate a "legitimate expectation of delivery." Almost every factor identified in *Andersons* as indicative of a forward contract, exempt from CFTC regulation, is present here. The only parties to the contract were the farmer-Plaintiffs and the elevator-Defendants. *See* ECF Nos.1-1; 1-2; 1-5; 1-6. Although AgriVisor LLC was a third-party beneficiary to the Accumulator Addendums, it was not a signatory and no evidence suggests it was a speculator on the futures market. *See* ECF No. 1-2 at

---

[7] Although Plaintiffs refers to four different contracts throughout their Complaint—(1) the "Grain Contracts" with Ida; (2) the "Pricing Addendums" with Ida; (3) the "Accumulator Contracts" embedded within Ida's Pricing Addendums; and (4) the "Fraudulent Contracts" with Luckey—Plaintiffs concede that "[f]or purposes of Counts I, II, and III, the contracts all build off each other, or are tied together, and thus . . . all [four] as a whole are either subject to the CEA or not." ECF No. 17 at PageID.111.

PageID.52. The farmer-Plaintiffs were in the business of growing grain and the elevator-Defendants were in the business of obtaining grain. ECF No. 1 at PageID.7–9. The Plaintiffs do not allege that the elevator-Defendants lacked the capacity to accept Plaintiffs' grain. *See generally* ECF No. 1. Further, the record suggests that Plaintiffs had, collectively, at least two years of contractual dealings with Ida and Luckey which involved a payment of cash upon actual delivery—and Plaintiffs do not allege otherwise.[8] *Compare id.* at PageID.4 (noting Plaintiffs entered Grain Contracts "[b]eginning in 2019 or 2020) *with* ECF No. 1-6 at PageID.60 (noting Plaintiffs rolled over contracts with Luckey throughout August 2022).

The Grain Contracts attached to Plaintiffs' Complaint further support the conclusion that the contracts were forward—rather than futures—and were executed to accomplish the actual delivery of grain in exchange for money. Plaintiffs attached three Grain Contract documents to their Complaint: (1) a Commodity Purchase Contract[9] between Dzurka Bros and Ida, ECF No. 1-1; (2) an Accumulator Addendum signed by Dzurka Bros and Ida, ECF No. 1-2; and (3) two "Futures/Cash Purchase Contracts" between Fergus Farms and Luckey. ECF Nos. 1-5; 1-6.

The Commodity Purchase contract identifies a specific commodity (corn); a specific quantity (20,000 bushels); a specific delivery period; and referred to the AgriVisor Accumulator Addendums for the specific price basis. ECF No. 1-1 at PageID.49. By signing these contracts, Plaintiffs warranted "that all grain *delivered hereunder* will be grown" in the U.S. and the Parties

---

[8] Both Defendants assert that their contractual relationship with Plaintiffs included a history of delivery and payment  ECF Nos. 13 at PageID.85; 19 at PageID.146.

[9] Plaintiffs refer to this document as an example of the "Grain Contracts" utilized by Ida. ECF No. 1 at PageID.17. Defendant Luckey refers to this document as a "contract confirmation." ECF No. 13 at PageID.85. Defendant Ida refers to this document as an example of the "at-issue contracts." ECF No. 19 at PageID.141.

agreed that Ida's "*acceptance of any delivery* of grain" after breach would not waive remedies. *Id.* (emphasis added).

The Accumulator Addendum similarly specifies the commodity (corn); the quantity (20,000–40,000 bushels); and the price. ECF No. 1-2 at PageID.50. The Accumulator Addendums further instruct the farmer-Plaintiffs to "set . . . the *Location/Delivery* Point for the commodity and *Shipment Period*[.]" ECF No. 1-2 at PageID.51 (emphasis added). The Accumulator Addendum further notes that the signatories "warrant to the other as of the date of the Contract, and *every delivery hereunder*, that each has entered into the Contract as principal acting for its own account[.]" *Id.* (emphasis added). Indeed, the Accumulator Addendum expressly provides.

> **No Futures or Options Contract.** By entering into the Contract and this Addendum, [Plaintiff] does not open a futures or an option account or enter into a futures or options position for the [Plaintiff] with the [Defendant] or any third party. The Contract and this Addendum employ futures or options contracts solely as a commodity pricing mechanism. *The Contract and this Addendum do not constitute a futures or options contract.*

*Id.* (italics added).

And although Plaintiffs also attached contracts signed by Luckey titled "Futures/Cash Purchase Contract[s]," these contracts also contemplate a specific quantity of a specific commodity to be delivered to a "terminal destination" set by the farmer and confirmed by Luckey. *See* ECF Nos. 1-5 at PageID.57; 1-6 at PageID.60.

Indeed, the only *Andersons* forward contract factor that is *not* present in this case is the farmer's ability to deliver under the contracts. Plaintiffs allege that the Grain Contracts with Defendants required Plaintiffs to deliver volumes of grain that "vastly exceeded any realistic expectation" of actual delivery. ECF No. 1 at PageID.21, 25, 27. Plaintiffs also allege that the Contracts called them "to deliver grain in quantities that far exceed[ed] their production capacity[.]" *Id.* at PageID.3, 43.

Thus, with a score of 6-to-1, the *Andersons* factors suggest the Parties shared a legitimate expectation of delivery and, therefore, the Grain Contracts in question appear to be forward contracts exempt from CFTC regulation. But, the seven factors identified in *Andersons* are not dispositive. Importantly, the Sixth Circuit has identified one additional factor relevant throughout this forward v. futures inquiry; and Plaintiffs' ability to survive Defendants' Motions to Dismiss on Counts I, II, and III depends on it.

### iv. Roll Over Allegations

Plaintiff's core argument that the Grain Contracts were futures contracts subject to CFTC regulation is that the contracts lacked a legitimate expectation of actual delivery because the Accumulator Addendums called for unrealistic delivery quantities and, more importantly, could be infinitely rolled. ECF No. 1 at PageID.22.

In *Andersons*, the farmers argued that, even if their contracts with the elevators were *facially* forward contracts, they did not contemplate "actual delivery" because they allowed for "infinite rolling." *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 320 (6th Cir. 1998). The farmers supported this argument with (1) their own testimony that farmers and elevators had an "oral understanding" that the farmers could repeatedly roll forward their contracts and did not need to deliver grain; (2) some contracts that were rolled ahead; and (3) expert testimony that rolling was exclusive to futures contracts. *Id.* And although the Sixth Circuit said this was not enough to survive *summary judgment*, it noted that this evidence would suffice to survive a motion to dismiss:

> [T]he mere assertion of potentially infinite rolling does not create a disputed issue of fact. In *Eby*, the court observed that *proof of potentially unlimited rolling was "a factor"* in determining whether a contract fell within the cash forward exclusion. It therefore refused to dismiss for failure to state a claim a case alleging that a . . . contract allowed for infinite rollovers. We interpret *Eby* as holding that *unlimited rolling may be evidence showing that actual delivery is not contemplated*. In any event, we think that the mere possibility of infinite rolling is not dispositive; whether actual delivery is contemplated remains the focal question.

- 18 -

*Id.* at 321 n. 20 (emphasis added); *see also Eby v. Producers Co-op, Inc.*, 959 F. Supp. 428, 433

(W.D. Mich. 1997) (denying elevator-defendant motion to dismiss CEA claims when plaintiffs

alleged that contracts allowed for unlimited rolling); *Andersons, Inc. v. Crotser*, 7 F. Supp. 2d 931,

935 (W.D. Mich. 1998) (classifying *Eby* as holding "that an allegation of infinite rollovers was

sufficient to defeat a 12(b)(6) motion to dismiss[.]").

Here, Plaintiffs' Complaint alleges that the Grain Contracts were capable of infinite rolling.

ECF No. 1 at PageID.21–22, 33. Plaintiffs provide the deposition testimony of Alan Peters—Ida's

former Grain Marketer who moved to Luckey along with the assigned Grain Contracts—from a

state case between Ida and Plaintiff Maple Row Farms:

> Q: Did you explain to the farmers, who signed up for [the Accumulator
> Addendums], that there were circumstances in which the amount of grain that they
> were obligated to provide could be doubled?
> **A: We talked about that if those situations arose, that that's what we would
> work through them by means of being able to roll them ahead, cancel them,
> work out extended delivery terms, so it would not be detrimental to the farm.**
>
> Q: As I understand it, that the farmer did have the option to roll forward or roll
> ahead the delivery dates on these contracts; is that correct?
> A: **Yes. And we did not put an end date to that either**.
>
> Q: As I understand it, what you're telling me is that someone could roll ahead those
> contracts indefinitely?
> **A: Yes**
>
> Q: So according, what your testimony is, is that these contracts could be rolled over
> indefinitely; basically, rolled out to infinity, is what you're indicating.
> **A: Yes**.
>
> Q: So in essence, they would never have to provide the additional grain, since they
> could just continue to roll it.
> **A: There's a lot of market factors that come into play that would -- may or
> may not affect that.**

ECF No. 1 at PageID.20–21 (emphasis in original). And although the Accumulator Addendums

do not expressly include a roll over option, the "Futures/Cash Contracts" attached to Plaintiffs'

- 19 -

Complaint confirm that Plaintiff Fergus Farms rolled its soybean Contract from at least December 2021 through November 2022, *see* ECF No. 1-6, and rolled its corn Contract from at least December 2021 through December 2022. *See* ECF No. 1-5.

In sum, although the Grain Contracts between Plaintiffs and Defendants facially appear to be forward contracts, Plaintiffs have sufficiently alleged that these Contracts *could* be infinitely rolled and, therefore, the Parties did not share a legitimate expectation of actual delivery. Having established that Plaintiffs have properly pleaded the Grain Contracts were, as a threshold matter, subject to CFTC regulation under the CEA,[10] this Court turns to Plaintiffs' three CEA claims.

### 2.  Fraudulent Misrepresentation in Connection with Futures Transactions (Count I)

In Count I of the Complaint, Plaintiffs allege that "Defendants made false, misleading, and coercive statements in connection with the creation of the [Grain] Contracts and in their attempts to secure Plaintiffs' grain and payments[,]" and created contracts "designed to defraud and mislead" in violation of the of the CEA, 7 U.S.C 6b(a).[11] ECF No. 1 at PageID.39–40. But because Plaintiffs have not satisfied the heightened pleading standard of Civil Rule 9(b) for allegations involving fraud, this Count will be dismissed.

The CEA "authorizes civil suits against those who defraud, cheat, or deceive another person, or who manipulate prices or use manipulative or deceptive devices in connection with the sale of commodities." *LJM Partners, Ltd. v. Barclays Cap. Inc.*, No. 19 CV 368, 2023 WL

---

[10] This holding is limited. Although Plaintiffs have *pleaded* their Grain Contracts were futures contracts subject to CFTC regulation, Plaintiffs have not *proven* this classification. *See Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 321 (6th Cir. 1998) (granting defendants summary judgement when contracts were facially forward contracts, despite allegations that they could be infinitely rolled); *Andersons, Inc. v. Crotser*, 7 F. Supp. 2d 931, 935 (W.D. Mich. 1998) (noting that the mutual consent of farmer and elevator to roll ahead "substantially limits" the likelihood that a contract can be infinitely rolled).
[11] Plaintiffs' Complaint incorrectly cites "7 U.S.C. § 6b(a)(i) and (iii)," ECF No. 1 at PageID.39, but those sub-sections do not exist. *See* 7 U.S.C. § 6b(a).

- 20 -

6311471, at *2 (N.D. Ill. Sept. 28, 2023) (citing 7 U.S.C. § 6b). Specifically, Section 4b of CEA

provides that it is unlawful for futures contract parties to:

> (A) cheat or defraud or attempt to cheat or defraud the other person;
> (B) willfully to make or cause to be made to the other person any false report or statement
> or willfully to enter or cause to be entered . . .  any false record; [or]
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in
> regard to any order or contract or the disposition or execution of any order or contract, or
> in regard to any act of agency performed, with respect to any order or contract for . . .  the
> other person[.]

7 U.S.C. § 6b(a).

As a claim involving "fraud or mistake," a party alleging a fraudulent and misleading

contract in violation of 7 U.S.C. § 6b(a) must state such claim "with particularity." FED. R. CIV. P.

9(b). The purpose of this heightened pleading standard is to provide defendants with more specific

notice "as to the particulars of their alleged misconduct." *United States ex rel. Prather v. Brookdale

Senior Living Communities, Inc*., 838 F.3d 750, 771 (6th Cir. 2016) (quoting *U.S. ex rel. Bledsoe

v. Cmty. Health Sys., Inc.*, 501 F.3d 493 (6th Cir. 2007). To plead a fraud or mistake claim with

particularity, the plaintiff must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.,

Inc.*, 29 F.4th 802, 810 (6th Cir. 2022); *Louisiana Sch. Employees' Ret. Sys. v. Ernst & Young,

LLP*, 622 F.3d 471, 478 (6th Cir. 2010); *Frank v. Dana Corp*., 547 F.3d 564, 569 (6th Cir. 2008).

Plaintiffs have not pleaded their fraudulent contract CEA claim with particularity. The

thrust of Plaintiffs' claim is that they were induced, through Defendants' "representations," to

enter contracts which would, at times, call for the doubling-up of their grain production. *See* ECF

No. 1 at PageID.39. But the Complaint does not identify what these representations were; nor does

it explain how Plaintiffs were induced beyond conclusory claims. *See generally* ECF No. 1.

Plaintiffs do not identify *any* statement made by *any* Defendant to *any* Plaintiff—let alone one that would plausibly induce the Plaintiffs' entrance into the Grain Contracts. *See id.*

Plaintiffs argue in Response to Defendant Luckey's Motion to Dismiss that Alan Peter's unrelated state case deposition testimony—included in Plaintiffs Complaint—satisfies their burden to plead fraud with particularity. ECF No. 17 at PageID.125. It does not. Although Alan Peters' deposition testimony was sufficient to plausibly plead that the Grain Contract were *futures* contracts subject to the CEA, it is insufficient to plead with particularity that they were *fraudulent* contracts, in violation of the CEA. First, Peters' statements at his deposition were to a deposing attorney, not to any Plaintiff in this case. Second, Peter's deposition was conducted years after Plaintiffs entered the Grain Contracts with Defendants. *See* ECF No. 18 at PageID.137. Third, the state case Peters was deposed in involved only Defendant Ida and Plaintiff Maple Row Farms— two of the twelve Parties to this case. Fourth, to the extent Peters indicated in this testimony that, at some point, he told some farmers, that Ida would "work through" Accumulator Addendum issues as they arose in the future, this statement is not fraudulent. Michigan law defines fraudulent misrepresentations as "statements of *past or existing fact*, rather than *future promises*[.]" *Tocco v. Richman Greer Pro. Ass'n,* 912 F. Supp. 2d 494, 516 (E.D. Mich. 2012), *aff'd*, 553 F. App'x 473 (6th Cir. 2013) (emphasis added). An exception to this "future fraud" rule applies when "there is evidence that [such future promise] was made with a present undisclosed intent not to perform" or—when evidence of intent is lacking—"the facts of the case compel the inference that the promise was . . . a devise to perpetuate a fraud." *Id.* (emphasis omitted). But Plaintiffs have not alleged this evidence of fraudulent intent existed; and this case does not compel the inference that this future promise was a devise to perpetuate fraud. On the contrary, Plaintiffs' Complaint demonstrates that Ida *did* "work through" issues as they arose and allowed Plaintiffs to roll over

their Grain Contracts numerous times. *See* ECF Nos. 1-5 (Fergus Farms rolled over its corn contract five times); 1-6 (Fergus Farms rolled over its soybean contract four times).

Plaintiffs also argue, in Response to Defendants' Motions to Dismiss, that they sufficiently pleaded fraud with particularity on the basis of Defendants' alleged *omissions*. ECF No. 17 at PageID.127. Specifically, Plaintiffs allege Defendants defrauded them by failing to disclose the "full ramifications" of or "important information" concerning the Accumulator Addendums: that they could "double-up." *See* ECF No. 1 at PageID.24, 45–46. But a plaintiffs pleading fraud by omission still must plead their claim with particularity. *Wozniak v. Ford Motor Co.*, No. 17-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019) ("Specifically, a plaintiff pleading a fraudulent omission must allege (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." (internal citations omitted)). Plaintiffs have not done so here. And the Accumulator Addendums—which Plaintiffs affirmatively signed—speak for themselves. *See* ECF No. 1-2 at PageID.50–51 (explaining that Plaintiffs' grain productions would double from 20,000 to 40,000 bushels depending on futures market fluctuation).

In sum, Plaintiffs have not identified any particular statement or omission made by any particular Defendant to any particular Plaintiff that could plausibly be considered fraudulent. Accordingly, Plaintiffs have not satisfied the Civil Rule 9(b) pleading-with-particularity standard for fraud claims and Count I will be dismissed for failure to state a claim.

### 3. Illegal Off-Exchange Fictitious Sales (Count II)

In Count II of the Complaint, Plaintiffs allege that the Grain Contracts were illegal "fictitious sales" in violation of Section 4c(a) of the CEA, 7 U.S.C. § 6c(a). ECF No. 1 at

PageID.39–40. But the facts in Plaintiffs' Complaint—even when assumed true—do not demonstrate that Defendants effectuated the Grain Contracts with the intent to avoid taking a genuine position in the market; nor that the Grain Contracts merely had the *appearance* of being subject to the open futures market but, in reality, worked to protect Defendants from market risk. Accordingly, Plaintiffs have not plausibly pleaded a fictitious sale, and Count II will be dismissed.

Section 4c of the CEA was intended by Congress to ensure that all futures trades are focused within a centralized marketplace and to ensure active participation in the competitive determination of the price of futures contracts. *In re Morgan Stanley & Co., LLC*, CFTC No. 12-22, 2012 WL 3262462, at *4 (June 5, 2012). Section 4c(a) of the CEA "makes it unlawful for any person to enter into . . . the execution of a [futures] transaction that is a fictitious sale."[12] *U.S. Commodity Futures Trading Comm'n v. Yumin Li*, 2016 WL 8256392, at *6 (N.D. Ill. Dec. 9, 2016); *In re Morgan Stanley*, 2012 WL 3262462, at *4 (June 5, 2012); *see also* 7 U.S.C. § 6c(a)(1)–(2). Although the term is undefined by Congress, fictious sales are best thought of as a "general category" of sales including wash sales,[13] accommodation trades,[14] and prearranged

---

[12] Section 4c(a) was generally "intended to prevent collusive trades conducted away from the trading pits. The fear of Congress was that brokers could unfairly manipulate the terms of trade[.]" *Merrill Lynch Futures Inc. v. Kelly*, 585 F. Supp. 1245, 1251 n. 3 (S.D.N.Y. 1984); *see also* Gregory Scopino, *Do Automated Trading Systems Dream of Manipulating the Price of Futures Contracts? Policing Markets for Improper Trading Practices by Algorithmic Robots*, 67 FLA. L. REV. 221, 264 (2015) ("The CFTC has stated that the common denominator of the specific abuses prohibited in § 4c(a) . . . is the use of trading techniques that give the appearance of submitting trades to the open market while negating the risk or price competition incident to such a market." (internal citations omitted)).

[13] A wash sale involves a near simultaneous buying and selling of futures which "produces a virtual financial nullity because the resulting net financial position is near or equal to zero. Such transactions are considered harmful because they create illusory price movements in the market." *Wilson v. Commodity Futures Trading Comm'n*, 322 F.3d 555, 559 (8th Cir. 2003).

[14] "Accommodation trading involves ostensibly independent trades that were actually envisioned as paired at the time of initiation. The paired trades are designed to offset each other with little or no change in the trader's financial position." *In re Maksim Baron*, CFTC No. 12-30, 2012 WL

trading.[15] *See In re Jie "Elaine" Yu*, CFTC No. 23-46, 2023 WL 6307115, at *2 (Sep. 22, 2023);

*see also Commodity Futures Trading Comm'n v. TFS-ICAP, LLC*, 432 F. Supp. 3d 320, 324

(S.D.N.Y. 2020). Regardless of form, the defining characteristic of a fictious sale is one which

"gives the appearance of submitting trades to the open market but is protected from market risk

and price competition." *Yumin Li*, 2016 WL 8256392, at *6; *see also In the Matter of Solomon

Mayer*, CFTC No. 92-21, 1998 WL 39411, at *21 (Feb. 3, 1998).

Importantly, a sale is only "fictitious" in violation of Section 4c(a) of the CEA if the sale

is made "with the intent to avoid taking a genuine position in the market." *Yumin Li*, 2016 WL

8256392, at *6; *see also Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 119 (2d

Cir. 1999) (noting a plaintiff "must prove intent to establish a violation of . . . Section 4c of the

CEA"); *Commodity Futures Trading Comm'n v. TFS-ICAP, LLC*, 432 F. Supp. 3d 320, 325

(S.D.N.Y. 2020) (denying motion to dismiss Section 4c(a) CEA claim when CFTC sufficiently

alleged intent to negate risk or price competition and avoid a bona fide market position).

Plaintiffs have not stated a valid claim that Defendants engaged in fictitious sales in

violation of Section 4c(a) of the CEA. Plaintiffs merely claim these contracts are "fictitious" and

"sham documents" imposing "sham obligations." *See* ECF No. 1 at PageID.39–43. But these

conclusory statements do not allege that the Grain Contracts had "the appearance of submitting

trades to the open market" while, in reality, were effectuated to protect Defendants from market

risk and price competition. *See generally* ECF No. 1 at PageID.16–40. On the contrary, the Grain

---

3068027, at *3 (July 26, 2012). "[B]y pairing the ostensibly independent trades at the time of initiation, the trader can predictably reduce risk to an inconsequential level." *Id.*

[15] A prearranged trade involves two parties determining trade information such as price and quantity outside of a futures market, then using a futures market mechanism to "shield the private nature of the bargain from public scrutiny" thereby eliminating price competition and market risk. *In re Absa Bank, Ltd.*, 2014 WL 4793544, at *2 (Sep. 25, 2014).

Contracts described within and attached to Plaintiffs' Complaint do not protect *either party* from market risk or price competition. Recall that, under the Accumulator Addendums, both Parties faced risk each accumulation period: the Plaintiffs risked the doubling-up of their grain production if the Futures Price rose above the Fixed Price ceiling; and the Defendants risked the termination of the Grain Contracts altogether if the Futures Price fell below the Knockout Price floor; and risked paying Plaintiffs *more* than market value for grain if the Futures Price remained between the Fixed Price and the Knockout Price. Indeed, market risk is *inherent* with the Grain Contracts as described by Plaintiff's Complaint. ECF No. 1 at PageID.11 (describing accumulator contracts as "tied to a futures contract price[,]" and noting the quantity of weekly bushels to be delivered each week under the Accumulator Addendums was "determined . . . by the current [Futures] Price[.]").

Further, Plaintiffs have not alleged—let alone identified supporting facts—that Defendants created the Grain Contracts with the intent to avoid taking a genuine position in the market. *See generally* ECF No. 1. Indeed, in Response to Defendant Luckey's Motion to Dismiss, Plaintiffs merely define "fictitious sales" and argue "[t]he grounds and claims by Plaintiffs clearly would fit within the parameters of the CFTC's characteristics of fictitious sales." ECF No. 17 at PageID.124. But how? Plaintiffs do not say, and their Complaint does not show.[16] Even if all the facts in

---

[16] In Response to Defendant Luckey's Motion to Dismiss, Plaintiffs cite *In re Harold Collins, et al.*, CFTC No. 77-15, 1986 WL 66165 (Apr. 4, 1986) to support the proportion that they have sufficiently pleaded a fictitious sale. ECF No. 17 at PageID.124. But the facts in *In re Harold Collins* are dissimilar from the facts at hand. In *In re Harold Collins*, the CFTC determined an individual engaged in a fictitious wash sale because he virtually simultaneously sold and repurchased potato futures at substantially the same price, but with later delivery dates so he could take advantage of increased futures prices. *See Stoller v. Commodity Futures Trading Comm'n*, 834 F.2d 262, 263 (2d Cir. 1987). The individual admitted he "was attempting to effect the buy and sell [of futures trades] as close as possible." *In re Harold Collins*, 1986 WL 66165, at *5. The CFTC expressly found that he was "effectively buying from and selling to himself . . . eliminat[ing] or sharply reduc[ing] his risk of loss." *Id.* at *7.  And the CFTC stressed that fictitious sales

- 26 -

Plaintiffs' Complaint are assumed true, they have not plausibly pleaded that the Grain Contracts were fictitious in violation of Section 4c of the CEA. Accordingly, Count II will be dismissed for failure to state a claim.

### 4. Commodities Trade Advisor Fraud (Count III)

Turning to Count III of the Complaint, Plaintiffs allege Defendants acted as Commodity Trade Advisors and, accordingly, violated Section 4m of the CEA by not being registered, and violated Section 4o of the CEA by defrauding Plaintiffs. ECF No. 1 at PageID.41–42. But Plaintiffs have not sufficiently pleaded that Section 4m's CTA registration requirement applied to Defendants, and have not pleaded fraud under Section 4o with particularity, so Count III will be dismissed.

The CEA defines a Commodity Trade Advisor (CTA) as any person who:

(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in . . . any [futures contract] . . . ;
(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i);
(iii) is registered with the Commission as a [CTA]; or
(iv) the Commission, by rule or regulation, may include if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

7 U.S.C. § 1a(12)(A)

Plaintiffs allege that Defendants were CTAs because they generally "advised" Plaintiffs to enter the Grain Contracts including the Accumulator Addendums. ECF No. 1 at PageID.2, 4, 7, 24, 33 42. Notably, CTAs are generally thought of as those who are *in the business* of advising others as to the value or advisability of futures transactions, *see Commodity Trading Advisor (CTA)*

---

"present [a] false appearance" and involve "market place circumvention." *Id.* at *8 n. 24. Plaintiffs allege nothing of the sort, here.

*Registration*, NAT'L FUTURES ASS'N, https://www.nfa.futures.org/registration-membership/who-

has-to-register/cta.html (last visited Dec. 14, 2023) [https://perma.cc/FJD5-LWLD]. In contrast,

Plaintiffs allege Defendants are "in the business of buying grain from farmers" and selling the

grain to end-users. ECF No. 1 at PageID.3. But even assuming Defendants acted as CTAs in

"advising" Plaintiffs to enter the Grain Contracts, Plaintiffs have not stated a claim under Sections

4m or 4o of the CEA, 7 U.S.C. §§ 6m and 6o.

Plaintiffs argue Defendants violated Section 4m of the CEA by using the mail or channels

of interstate commerce to advise Plaintiffs to enter into the Grain Contracts, without being

registered as CTAs by the National Futures Association. ECF No. 1 at PageID.37, 41–42. But this

is insufficient to state a valid claim. Importantly, while Section 4m of the CEA requires *some*

CTAs to be registered before using the mail or an instrumentality of interstate commerce in

connection with their business as CTAs, this requirement expressly does *not* apply to, relevantly,

*any* CTA who (1) is a seller in a "cash market transaction[;]" or (2) "has not furnished commodity

trading advice to more than fifteen persons and who does not hold himself out generally to the

public as a [CTA]." 7 U.S.C. §6m(1). And although Plaintiffs have plausibly pleaded the Grain

Contracts are futures contracts, and thus Defendants were not sellers in a forward or cash market

transaction, ECF No. 1 at PageID.42; discussion *supra* Section III.A.1., nothing in Plaintiffs

Complaint suggests that Defendants "advised" more than 15 individuals and nothing suggests

Defendants held themselves out as CTAs to the general public. On the contrary, Plaintiffs

themselves identify Defendants as in the business of buying and selling grain, not advising others

in futures trades. ECF No. 1 at PageID.3. And even if Defendants "advised" *all ten* Plaintiffs in

this case, Plaintiffs do not allege Defendants advised anyone else—let alone *more than 15 persons*

as to the value of any futures transaction—so a claim that Defendants violated Section 4m of the CEA because they acted as unregistered CTAs will not lie.

The same result for Plaintiffs' claim that Defendants violated Section 4o of the CEA. Section 4o of the CEA provides:

> (1) It shall be unlawful for any [CTA] . . . . by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
>> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6o(1).  But "the requirements for a fraud claim under §4o are basically the same as for a fraud claim under §4b [discussed *supra* Section III.A.2]. The elements are derived from the common law action for fraud." *First Nat. Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir. 1987).[17] To establish a violation of Section 4o, a plaintiff must prove that a defendant "misrepresented a material fact which was intended to induce reliance, that [plaintiff] reasonably relied on the misrepresentation, and that the reliance was the proximate cause of [plaintiff's] damages." *Id.* Accordingly, for the same reasons Plaintiffs failed to state a claim for fraudulent misrepresentations in violation of Section 4b of the CEA (Count I), Plaintiffs fail to state a claim, here. *See supra* Section III.A.2. Plaintiffs have not shown any particular statement or omission by any particular Defendant to any particular Plaintiff that could plausibly be considered fraudulent to state a valid claim under both Sections 4b and 4o of the CEA.

---

[17] Notably, all Parties discuss Count I (fraud in futures transactions, in violation of the CEA), Count III (fraud by a CTA, in violation of the CEA), and Count VII (common law fraud and fraud in the inducement) in tandem. Plaintiffs' pleadings suggest that, for the purposes of Civil Rule 9(b)'s heightened pleading requirement for fraud claims, all three counts rely on the same factual allegations and rise and fall as one group of claims. *See* ECF Nos. 13 at PageID.94–96 (Luckey's Motion to Dismiss); 17 at PageID.125–27 (Plaintiffs' Response); 18 at PageID.137 (Luckey's Reply); 22 at PageID.183–85 (Ida's Reply).

In sum, even assuming Defendants advised Plaintiffs to enter into the Grain Contracts using instrumentalities of interested commerce, Plaintiffs have not stated a valid claim under Section 4m of the CEA because they have not sufficiently alleged the registration requirement applies to Defendants; and Plaintiffs have not stated a valid claim under Section 4o of the CEA because they have not pleaded fraud with particularity. Count III will be dismissed.

### B.  Recission (Count IV)

Count IV of Plaintiffs' Complaint is titled "Recission Under the Uniform Commercial Code" and concludes by claiming "Plaintiffs are entitled to rescission and to a return of the status quo . . . based on Defendant's fraud in the inducement, as described herein." ECF No. 1 at PageID.42–44. But rescission is an equitable remedy, not a cause of action. *FCS Auto. Int'l, Inc. v. G&I IX E&E SPEC, LLC*, No. 21-CV-12122, 2022 WL 3703193, at *3 (E.D. Mich. Apr. 26, 2022) (construing rescission count as a form of relief, not a cause of action, noting "recission is a remedy for fraudulent inducement . . . [and] fraud."); *Yaldu v. Bank of Am. Corp.*, 700 F. Supp. 2d 832, 847 (E.D. Mich. 2010); *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 842 n. 2 (6th Cir.2007). So, Count IV will be dismissed for failure to state a claim upon which relief can be granted.

### C.  Unjust Enrichment (Count V)

Turning to Count V, Plaintiffs allege that Defendants were unjustly enriched at the expense of Plaintiffs. ECF No. 1 at PageID.44–45. Defendants argue that Count V fails to state a claim because the Parties' relationships were governed by express and enforceable contracts. ECF Nos. 13 at PageID.97–98; 19 at PageID.153–54. Plaintiffs concede that parties to an express and enforceable contract cannot recover on an unjust enrichment claim but argue that the Grain

Contracts are *not* enforceable because "among other things,"[18] the Grain Contracts were fraudulent.  ECF Nos. 17 at PageID.128–29; 21 at PageID.171.

To succeed on an unjust enrichment claim under Michigan law,[19] a plaintiff must prove (1) a defendant's receipt of a benefit from the plaintiff; and (2) an inequity to the plaintiff as a result. *Oldnar Corp. v. Panasonic Corp. of N. Am.*, 766 F. App'x 255, 265 (6th Cir. 2019) (citing *AFT Mich. v. Michigan*, 846 N.W.2d 583, 590 (Mich. App. 2014) and *Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 663 (Mich. 1991)). "Under an unjust enrichment theory of recovery, the court *implies* a contract to prevent a party from inequitably receiving a benefit from another." *Id.* (emphasis added). But a contract will only be implied "if there is no express contract covering the same subject matter." *Id.* at 266 (quoting *Landstar Express Am., Inc., v. Nexteer Auto. Corp.*, 900 N.W.2d 650, 656 (Mich. App. 2017) and *Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271, 280 (Mich. App. 2003). Accordingly, a plaintiff cannot recover on a claim of unjust enrichment "if there is a valid and enforceable contract[.]" *Id.* at 255.

Here, the Grain Contracts attached to Plaintiffs' Complaint were express agreements, written and signed by both Plaintiffs and Defendants. *See* ECF No. 1-1; 1-2; 1-5; 1-6. And although Plaintiffs argue that Defendants' "fraud" renders the Grain Contracts unenforceable—and, thus, unjust enrichment applicable—Plaintiffs have not stated valid fraud claims against Defendants. *See supra* Section III.A.2 (CEA fraud); *supra* Section III.A.4 (CEA advisor fraud; *see infra* Section III.E (common law fraud). Accordingly, Plaintiffs have not stated a valid unjust enrichment claim against Defendants, so Count V will be dismissed.

---

[18] Plaintiffs do not identify what "other things" render the Grain Contracts unenforceable. *See* ECF No. 17 at PageID.128–29.
[19] The Grain Contracts are governed by Michigan law. ECF No. 1-1 at PageID.49.

### D.  Negligence (Count VI)

In Count VI of the Complaint, Plaintiffs allege Defendants were negligent. Defendants seek dismissal, arguing that Plaintiffs claim is barred because they have not alleged that Defendants owed any duty to Plaintiffs aside from those provided in the Grain Contracts. ECF Nos. 13 at PageID.98–99; 19 at PageID.155. Defendants are correct, so Count VI will be dismissed.

Under Michigan law, the elements of negligence are (1) duty, (2) breach of that duty, (3) causation, and (4) damages. *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 357 (6th Cir. 2014) (citing *Brown v. Brown*, 739 N.W.2d 313, 316–17 (Mich. 2007)). "The threshold question of whether the defendant owed a duty to the plaintiff is a question of law to be decided by the court." *Id.* (citing *Fultz v. Union–Commerce Assocs.*, 683 N.W.2d 587, 590 (Mich. 2004)). But when the only duty plaintiff alleges is imposed by a contract, a negligence claim will not lie. *Hughes v. State Farm Mut. Auto. Ins. Co.*, No. 07-13542, 2008 WL 11355564, at *2 (E.D. Mich. Apr. 29, 2008) (dismissing negligence claim when plaintiff only alleged a contractual duty, noting a "proper allegation of [negligence] arising out of a contract requires a viable assertion that [d]efendant owed a duty to [p]laintiff that did not arise out of the contract between the parties."); *see also Fultz v. Union-Com. Assocs.*, 683 N.W.2d 587, 591 (Mich. 2004) ("a tort action will not lie when based solely on the nonperformance of a contractual duty" (collecting cases)). Thus, the question at this motion to dismiss stage, is "whether the plaintiff alleges a violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's Const. Corp. v. Michigan Bell Tel. Co.*, 559 N.W.2d 647, 658 (Mich. 1997); *see also Fraser Engine Rebuilder, Inc. v. Lancaster*, No. 360110, 2023 WL 5281853, at *7 (Mich. App. June 8, 2023).

Plaintiffs do not allege that Defendants owed them any "separate and distinct" duties aside from those promulgated by the Grain Contracts. Indeed, as Defendant Luckey points out, Plaintiffs

do not identify a "duty" at all. *See* ECF No. 13 at PageID.98–99. Instead, Plaintiffs' Complaint alleges Defendant Ida was negligent because it "at no time, cautioned Plaintiffs about the unique risks associated with the Contracts" and because it, "contrary to the standard practice of other grain elevators, at no time 'capped' the amount of bushels that could be generated by the Accumulator" Addendums. ECF No. 1 at PageID.45. Plaintiffs allege Luckey was negligent in "taking on the transfer of the contracts from I[da] as Luckey knew, or should have known, that Plaintiffs oversold their annual production." *Id.* But none of these claims contemplate separate and distinct duties from the Grain Contracts, so Plaintiffs have not sufficiently pleaded a negligence claim. *See Hughes v. State Farm Mut. Auto. Ins. Co.,* No. 07-CV-13542, 2008 WL 11355565, at *1 (E.D. Mich. Sept. 26, 2008) (dismissing negligence claim when plaintiff alleged defendant "failed to disclose" the full extent of a contract and "made false statements" in connection to the contract); *Spengler v. ADT Sec. Servs., Inc.*; 505 F.3d 456, 458 (6th Cir. 2007) (dismissing negligence claim when plaintiff alleged duties that "emanated only from the contract").

And, to the extent Plaintiffs may have identified a "separate and distinct" duty, their negligence claim is still subject to dismissal under the economic loss doctrine.[20] The economic loss doctrine, derived from the Uniform Commercial Code, is a "judicially created limitation on tort actions that seek to recover economic damages resulting from commercial transactions." *Quest Diagnostics, Inc. v. MCI WorldCom, Inc*., 656 N.W.2d 858, 861 (Mich. App. 2002). This doctrine separates damages stemming from breach of commercial contracts—in which buyers and sellers

---

[20] Contrary to Ida's briefing, ECF No. 19 at PageID.155, this analysis is *separate* from the threshold question of whether a plaintiff alleges a "separate and distinct duty" to state a valid negligence claim within a contracts dispute. *Fraser Engine Rebuilder, Inc. v. Lancaster*, No. 360110, 2023 WL 5281853, at *7 (Mich. App. 2023) (noting the doctrine of economic loss and the principles regarding raising tort claims for contractual breaches are "historically separate doctrines").

can negotiate their financial liability—and damages stemming from torts—in which no such negotiation occurs. *Lancaster*, 2023 WL 5281853, at *5; *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 616–17 (Mich. 1992). Accordingly, the Michigan economic loss doctrine "bars recovery for tort claims brought by a plaintiff seeking relief for solely economic loss arising out of an alleged breach of contract." *Carhartt, Inc. v. Innovative Textiles, Inc.*, 440 F. Supp. 3d 710, 715 (E.D. Mich. 2020)

Plaintiffs' Complaint merely alleges that they "have been damaged" by Defendant's alleged negligence. ECF No. 1 at PageID.45. But any damages that may arise from Plaintiffs' Complaint are wholly "economic losses" stemming from the "commercial transactions" Plaintiffs entered into with Defendants. Thus, even if Plaintiffs properly pleaded a negligence claim by identifying a "separate and distinct" duty aside from Grain Contract obligations, their negligence claim would be barred. In response to Ida's argument that the economic loss doctrine bars Plaintiffs' negligence claim, Plaintiff only argues that fraud in the inducement—an intentional tort—is exempted from the economic loss doctrine, "[t]hus, if this Court finds I[da] fraudulently induced the Plaintiffs to enter into the [Grain Contracts], the Plaintiffs can maintain their negligence claim." ECF No. 21 at PageID.172. But, as discussed below, Plaintiffs have failed to plead fraud in the inducement with the requisite particularity to survive Defendants' Motions to Dismiss, so Plaintiffs sole economic loss doctrine argument fails.

In sum, Plaintiffs' negligence claim will be dismissed because they have not alleged any duty of any Defendant "separate and distinct" from the Defendants' contractual obligations, and—to the extent they might have—they do not seek any damages other than economic loss.

### E.  Fraud and Fraud in the Inducement (Count VII)

In Count VII of their Complaint, Plaintiffs allege that Defendants committed fraud and fraud in the inducement. ECF No. 1 at PageID.45–46. Specifically, Plaintiffs allege that Ida "made fraudulent misrepresentations and/or failed to disclose important information to Plaintiffs so as to induce Plaintiffs to enter into the Contracts" when it "knew, or should have known, that Plaintiffs would rely on such misrepresentations and/or failure to disclose." *Id.* Plaintiffs also alleged they reasonably relied on these alleged misrepresentations and omissions, to their detriment. *See id.* at PageID.46. As to Defendant Luckey, Plaintiffs allege that Luckey changed the terms of the Grain Contracts "in a fraudulent manner so as to induce Plaintiffs to enter into the [n]ew [c]ontracts, all the while knowing that Plaintiffs were oversold in their production and could not meet said contract requirements." *Id.* But these allegations mirror those Plaintiffs alleged in Count I—alleging fraud in violation of Section 4b of the CEA—and Count III—alleging trader advisor fraud in violation of Section 4o of the CEA. And, as discussed, "the requirements for a fraud claim under [Section] 4o are basically the same as for a fraud claim under [Section] 4b" because both claims "are derived from the common law action for fraud." *First Nat. Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir. 1987). Indeed, the Parties' pleadings treat Counts I, III, and VII in tandem. *See* ECF Nos. 13 at PageID.94–95; 17 at PageID.124–27; 18 at PageID.137; Just as Counts I and III were dismissed for failure to plead fraud with particularity, Count VII will be dismissed too.[21] *See* discussion *supra* Sections III.A. 2 and 4.

---

[21] Plaintiffs argue that Ida did not explicitly discuss Count VII in its Motion to Dismiss and, therefore, "unless the response is imbedded somewhere in other portions of the [M]otion . . . Ida has not sought to dismiss Count VII." ECF No. 21 at PageID.173. In Reply, Ida explains it "inadvertently overlooked Plaintiffs' fraud and fraud[ulent] inducement claims . . . but intended to move for dismissal of Plaintiffs' entire complaint and seeks to move to dismiss the state-law fraud claims[.]" ECF No. 22 at PageID.183. And although Ida "consent[ed] to Plaintiffs filling a surreply" on this Count, *id.*, Plaintiffs chose not to file. Accordingly, and because Ida's arguments

As discussed, Civil Rule 9(b) requires a party pleading fraud to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see also Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950, 962 (E.D. Mich. 2017) (dismissing fraud in the inducement claim for failure to plead with particularity under Rule 9(b)). To satisfy this requirement, the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, (4) explain why the statements were fraudulent, (5) describe the fraudulent scheme, and (6) describe the resulting injury. *Id.* (citing *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) and *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466–67 (6th Cir. 2011)).

Plaintiffs' Complaint does not specify *any* statement made by *any* Defendant to *any* Plaintiff—let alone identify with specificity when and where these statements were made or how they were fraudulent. The *closest* Plaintiffs come to pleading a fraudulent misrepresentation with particularity is that, at some point, Alan Peters—the grain marketer assigned to Plaintiffs' contracts who moved from Ida to Luckey—told some farmers that Ida would work through issues under the Accumulator Addendums and would allow farmers to roll over their Grain Contracts. ECF No. 1 at PageID.19–21. And, as discussed, even if this general statement was made to these specific Plaintiffs—which the Complaint does not allege—this future promise is not fraudulent because Plaintiffs have not alleged Peters made this promise with the intent to break it, and the facts of Plaintiffs' Complaint show Ida *did* allow farmers to "work through" their Grain Contracts by rolling them. *See* discussion *supra* Section III.A.2. And Plaintiffs' allegation that Defendants fraudulently omitted that the Accumulator Contracts may force Plaintiffs to "double-up" their

---

largely mirrored Luckey's and have been fully replied to by Plaintiffs, *compare* ECF No. 22 at pageID.183–85 *with* ECF No. 13 at PageID.94–96, Count VII will be dismissed for failure to plead fraud with particularity as to both Defendants.

grain production is bellied by the express language within the Grain Contracts Plaintiffs attach to their Complaint and signed. *See* discussion *supra* Section III.A.2; *see also* ECF No. 1-2 at PageID.50–51 (explaining that Plaintiffs' grain productions would double from 20,000 to 40,000 bushels depending on futures market fluctuation).

Because Plaintiffs have not pleaded fraud with particularity as required by Civil Rule 9(b), Count VII will be dismissed.

### F.  Alternative Breach of Contract Claim as to Defendant Luckey (Count VIII)

Lastly, in Count VIII, Plaintiffs allege an alternative breach of contract claim against Defendant Ida.[22] Plaintiffs allege that Ida breached the Grain Contracts by refusing to allow Plaintiffs to roll ahead their contracts indefinitely and by transferring the Grain Contracts to Luckey without Plaintiffs' consent. ECF No. 1 at PageID.46–47. But neither of these actions breach the fully-integrated Grain Contracts attached to Plaintiffs' Complaint, since the Contracts do not include an anti-assignment provision nor any language concerning Plaintiffs' ability to roll. Accordingly, although the Grain Contracts are enforceable, Plaintiffs have not alleged that Ida breached them, so Count VIII will be dismissed.

To allege a breach of contract under Michigan law, a plaintiff must prove "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Prudential Def. Sols., Inc. v. Graham*, 498 F. Supp. 3d 928, 939 (E.D. Mich. 2020) (quoting *Miller-Davis Co. v. Ahrens Constr., Inc*., 848 N.W.2d 95, 104 (Mich. 2014)). Having concluded at this stage that the Grain Contracts are indeed enforceable contracts and that Plaintiffs

---

[22] Although unclear from the Complaint, Plaintiffs explained in their Response to Luckey's Motion to Dismiss that their breach of contract claim is only asserted against Ida. ECF No. 17 at PageID.130.

have not sufficiently alleged fraud to render them unenforceable, *see supra* Section III.C, this Court turns to the two breaches Plaintiff alleges. ECF No. 1 at PageID.47.

### 1. Infinite Rolling

Plaintiffs first argue that Ida breached the Grain Contracts because Ida stopped allowing Plaintiffs to roll ahead their Grain Contracts after Plaintiffs allege Ida "assured" them that Ida would "work through" the Contracts and accept rolling "indefinitely." ECF No. 1 at PageID.47. As Plaintiffs recognize, this alleged breach does not concern the text of the Grain Contracts— which are silent on the Plaintiffs' ability to roll, *see* ECF No. 1-1; 1-2; 1-6—but, instead, concerns alleged oral agreements between the Parties prior to the contract, implicating the parole evidence rule. ECF No. 21 at PageID.172.

Under the Michigan parole evidence rule, extrinsic evidence is inadmissible to "contradict the terms of a written contract that was intended to be the final and complete expression of the parties' agreement." *Ford Motor Co. v. AirPro Diagnostics LLC*, 632 F. Supp. 3d 753, 764 (E.D. Mich. 2022); *Cook v. Little Caesar Enter.*, 210 F.3d 653, 656 (6th Cir. 2000)*. Accordingly, when the parties include an integration clause—noting that the document as written is the final and complete expression of the parties' agreement—within the express terms of the contract, extrinsic evidence is inadmissible. *P.A.L. Env't Safety Corp. v. N. Am. Dismantling Corp*, No. 19-11630, 2021 WL 634633, at *4 (E.D. Mich. Feb. 18, 2021); *see also Norman Yatooma & Assocs. PC v. 1900 Assocs. LLC*, No. 313487, 2014 WL 2619445, at *9 (Mich. App. 2014).

Here, the Grain Contracts attached to Plaintiffs' Complaint do not contemplate a Plaintiff's ability to roll the Contract ahead, let alone indefinitely. *See generally* ECF Nos. 1-1; 1-2; 1-6. And

the Accumulator Addendums singed by the Plaintiffs fully integrated the Grain Contracts:

> **Entire Agreement; Priority; Amendment.** The Contract this Addendum, any enrollment from or other documentation required by Buyer, and any documentation, terms, conditions or other requirements established by AgriVisor from time to time related to the Programs *set forth the entire understanding and agreement of the parties related to the transactions contemplated in the Contract and this Addendum.*

ECF No. 1-2 at PageID.52. (italics added). Accordingly, as these fully integrated Contracts did not obligate Ida to allow Plaintiffs to infinitely roll over their contracts, Ida did not breach the Grain Contracts by refusing to do so.

Plaintiffs do not dispute that the Grain Contracts are fully integrated. *See* ECF No. 21 at PageID.173 Instead, Plaintiffs argue that fraud can render an integration clause inoperable and, accordingly, extrinsic evidence may be admitted in cases of fraud to allege and prove a breach of contract. *Id.* True enough. *Newburgh/Six Mile Ltd. P'ship II v. Adlabs Films USA, Inc.*, 724 F. Supp. 2d 740, 754 (E.D. Mich. 2010), *aff'd*, 483 F. App'x 85 (6th Cir. 2012) (noting extrinsic evidence is inadmissible when a contract is fully integrated "except in cases of fraud"). But, again, Plaintiffs have not sufficiently pleaded fraud to avail themselves of this integration work-around. *See supra* Sections III.A.2 and 4. Plaintiffs once again place the deposition testimony of Alan Peters on a pedestal as proof that fraudulent activity occurred here. *Id.* at PageID.174. But the testimony does not indicate that Peters or Ida ever told any specific Plaintiff that Ida would allow them to roll their Grain Contracts over infinitely. The testimony, at most, shows that Peters told *some farmers* (not necessarily Plaintiffs) at *some point in time* (not necessarily prior to entering the Grain Contracts) that Ida would "work through" contractual issues. *See* ECF No. 1 at PageID.20–21. And although Peters indicated to the deposing attorney that a farmer could, theoretically, roll ahead a contract indefinitely, the testimony does not suggest that Peters or Ida ever made this representation to a farmer, let alone any Plaintiff. *See id.*

Plaintiffs have not pleaded fraud with particularity to allow the extrinsic evidence of alleged oral agreements to alter the fully-integrated Grain Contract's express terms, which did not oblige Ida to allow Plaintiffs to roll their contracts indefinitely. Ida cannot breach a contractual provision that does not exist.

## 2.   Assignment

Next, Plaintiffs argue Ida breached the Grain Contracts by transferring them to Luckey without Plaintiffs' consent. ECF No. 1 at PageID.47. But under Michigan law, contractual rights can be assigned unilaterally unless assignments are clearly restricted by the express terms of the contract. *Jawad A. Shah, M.D., PC v. State Farm Mut. Auto. Ins. Co*., 920 N.W.2d 148, 158 (Mich. App. 2018); *Burkhardt v. Bailey*, 680 N.W.2d 453, 462 (Mich. App. 2004); *ISRA Vision, AG v. Burton Indus., Inc*., 654 F. Supp. 2d 638, 647 (E.D. Mich. 2009). Here, the Grain Contracts attached to Plaintiffs' Complaint contain no anti-assignment clause. *See* ECF Nos. 1-1; 1-2; 1-6. Accordingly, Ida was free to assign the Grain Contracts to Luckey, and Plaintiffs have not properly alleged that Ida breached the Grain Contracts by doing so.

In sum, Plaintiffs have not plausibly alleged that Ida breached the Grain Contracts by (1) refusing to allow Plaintiffs to indefinitely roll their contracts forward or (2) assigning the Contracts to Luckey. Count VIII will be dismissed.

## IV.

Accordingly, it **is ORDERED** that Defendant Luckey Farmers, Inc.'s Motion to Dismiss, ECF No. 13, is **GRANTED.**

Further, it is **ORDERED** that Defendant Ida Farmers Co-Operative Company, Inc.'s Motion to Dismiss, ECF No. 19 is **GRANTED.**

Further, it is **ORDERED** that Plaintiffs' Complaint, ECF No. 1, is **DISMISSED WITH PREJUDICE**.

**This is a final order and closes the above-captioned case**.

Dated: January 24, 2024                    s/Thomas L. Ludington
                                           THOMAS L. LUDINGTON
                                           United States District Judge